IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 3, 2025

## MIREILLE M. LEE v. THE VANDERBILT UNIVERSITY

**Appeal from the Chancery Court for Davidson County**
**No. 22-0621-I          Patricia Head Moskal, Chancellor**

_____

## No. M2024-00603-COA-R3-CV

_____

This appeal arises from a complaint filed by a faculty member against The Vanderbilt University ("Vanderbilt") after Vanderbilt rejected her applications for promotion and tenure during the academic years 2015-16 and 2018-19. The faculty member initially alleged one count each of gender discrimination, retaliation, and breach of contract but subsequently amended her complaint to omit the gender discrimination and retaliation claims. Concerning her breach of contract claim, the faculty member alleged that Vanderbilt had not followed its own policies and procedures for promotion and tenure when reviewing her tenure file and had shown bias against her, thus exhibiting a substantial departure from accepted academic norms and procedural regularity. After discovery, the parties filed competing motions for summary judgment. The trial court adopted this Court's deferential standard for reviewing promotion and tenure decisions by academic institutions as set forth in *Figal v. Vanderbilt Univ.*, No. M2012-02516-COA-R3-CV, 2013 WL 5459021 (Tenn. Ct. App. Sept. 27, 2013), and determined that Vanderbilt had not exhibited a substantial departure from accepted academic norms or procedural regularity in denying tenure to the faculty member. The trial court then determined that Vanderbilt had met its burden of negating an essential element of the breach of contract claim because the evidence was insufficient to establish that Vanderbilt had failed to follow its own tenure review process. The trial court further determined that the faculty member had failed to establish undisputed material facts that would entitle her to summary judgment. Accordingly, the trial court denied the faculty member's motion for summary judgment, granted Vanderbilt's motion for summary judgment, and dismissed the case with prejudice. The faculty member timely appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JEFFREY USMAN and VALERIE L. SMITH, JJ., joined.

Richard J. Braun, Gallatin, Tennessee, and Mary Leech, Nashville, Tennessee, for the appellant, Mireille M. Lee.

John M. Borkowski, Karen L. Courtheoux, and Catarina A. Colón, Chicago, Illinois, and Kevin C. Klein, Nashville, Tennessee, for the appellee, The Vanderbilt University.

**OPINION**

1.  Factual and Procedural Background

In 2008, Vanderbilt hired the plaintiff, Dr. Mireille M. Lee, as an assistant professor on the tenure track in its "Department of History of Art and Architecture" (the "Department"). The Department is one of thirty-four academic departments in Vanderbilt's College of Arts and Science (the "College"). Vanderbilt's Faculty Manual governs the policies and procedures for awarding tenure to eligible faculty members. In addition to the Faculty Manual, the College follows its own internal set of rules and procedures for reviewing faculty tenure applications and has memorialized these rules in two documents: (1) the "Rules and Procedures for Faculty Appointments, Renewals, Promotions and Tenure in the College of Arts and Science, Vanderbilt University" (the "College Rules")[1] and (2) the "Guidelines and Call for Recommendation for Promotions and Reappointments" (the "College Guidelines").

According to the College Rules, tenure-track faculty are typically hired by Vanderbilt for an initial probationary period of three years. Following a positive internal review by the faculty member's department, usually conducted during the second year, the faculty member may be eligible for a two-year extension of his or her employment contract. After a second performance review, conducted during the fourth year of employment, the faculty member's employment may be renewed for an additional three years. Generally, a College faculty member would apply for promotion and tenure during this second and final renewal period.

When a faculty member is ready to apply for promotion and tenure, the Faculty Manual provides for a "six-step review process." The tenure candidate prepares a tenure file which is reviewed by (1) the tenured faculty in the candidate's department, (2) the dean of the candidate's department, (3) Vanderbilt's university-wide Promotion and Tenure Review Committee (the "PTRC"), (4) the provost, (5) the chancellor, and (6) the board of trust. The parties agree that according to Vanderbilt's policies, a faculty member seeking an award of tenure must demonstrate "excellence in research, effective teaching, and satisfactory service."

---

[1] Although the Faculty Manual and College Rules were revised during the relevant period, the parties agree that those revisions are not relevant to the contested sections of the documents in the instant action.

The Department hired Dr. Lee in 2008 for an initial three-year term as an "assistant professor of history of art" on the tenure track. In July 2010, in accordance with the College Rules, Vanderbilt conducted a performance review of Dr. Lee, and the Department recommended that her employment be renewed for a second term. In 2013, Vanderbilt conducted Dr. Lee's fourth-year review, and again the Department recommended that Dr. Lee be renewed for another term of employment. As part of the fourth-year review, then-College Dean C.D. wrote a "counseling memorandum" concerning Dr. Lee's teaching, service, and research performance.[2] In the memorandum, Dean C.D. stated that it was "imperative that [Dr. Lee] accelerate her rate of publication at top peer-reviewed venues." The incoming and outgoing chairs of the Department subsequently met with Dr. Lee to discuss the counseling memorandum and to urge Dr. Lee to quickly publish her first book manuscript and to submit articles in her field to "flagship journals in classical studies" as well as other "peer reviewed journals" in the time remaining before her tenure review.[3]

In 2015, Dr. Lee applied for promotion and tenure. Dr. Lee prepared a "tenure file" in accordance with the guidelines set forth in the Faculty Manual, the College Rules, and the College Guidelines. According to the College Guidelines, a candidate's tenure file must include (1) recommendations for tenure from both the Department chairperson and a majority vote of the Department's tenured faculty; (2) a *curriculum vitae* from the time the candidate was hired; (3) an updated *curriculum vitae* at the time of the tenure review, listing the candidate's published works, works accepted for publication, and works in progress; (4) teaching evaluations and student comments; (5) the candidate's "statement of endeavors," providing more detail about the candidate's ongoing research, awards, appearances, and other academic achievements; (6) letters of evaluation from external reviewers; and (7) "counseling" letters from pre-tenure reviews conducted within the faculty member's department.

Dr. Lee provides the following more detailed summary of Vanderbilt's tenure

---

[2] Throughout this Opinion, the names of individuals who participated in Dr. Lee's tenure reviews will be represented by first and last initial only, in keeping with the January 11, 2025 protective order filed in the trial court and the motions to seal and redact the record filed in this Court by both parties. Additionally, we will only employ quotations from internal documents used by Vanderbilt during Dr. Lee's tenure review when such quotations are necessary to our analysis of the issues presented on appeal.

[3] The record does not include a definition of "peer-reviewed" or "refereed" journals. However, the parties use these terms interchangeably in reference to Dr. Lee's article and book chapter publications. For example, the PTRC Memorandum refers to articles published in "peer-reviewed journals." Dr. Lee lists the same published articles under the heading "Articles in refereed journals" in her *curriculum vitae* and statement of endeavors but refers to them as having been published in "peer-reviewed journals" in her appellate brief. The College Guidelines require that a tenure candidate list articles published in "refereed journals." Based upon the contents of the record before us, and for the purpose of rendering this Opinion, we will use "peer-reviewed" and "refereed" interchangeably depending upon which portion of the record we are discussing.

review process in her appellate brief:

> The senior tenured faculty members of the candidate's department review the promotion and tenure file, meet to deliberate its merits, and vote to recommend either to grant or deny promotion and tenure. The Department prepares a detailed summary of its deliberations, explaining the basis for their decision. The department chairperson writes a separate, confidential letter, reporting the chairperson's views on the faculty deliberations. The department chairperson then adds the summary of the faculty's deliberations and the chairperson's separate, confidential letter to the file, and forwards the candidate's tenure file to the appropriate Dean.

> The Dean then makes his or her own review of the candidate's tenure file with the assistance of a non-voting Senior Advisory Review Committee [SARC]. If the Dean recommends tenure, he or she forwards the candidate's tenure file to the appropriate Promotion and Tenure Review Committee [PTRC]. If the Dean recommends that tenure be denied, he or she reports that decision back to the department chairperson, after which the department's faculty members may vote to appeal the Dean's denial to the PTRC. If the Dean recommends tenure, the PTRC then reviews the recommendation "on the basis of its consistency with University standards and with the statement of standards and procedures required by the school." The PTRC reports all of its decisions to the Provost, and if the recommendation is a denial of tenure, the PTRC also reports its decision back to the Dean. An award of tenure requires the PTRC's positive recommendation, although the Dean may appeal a negative recommendation of the PTRC to the Provost[.]

(Citations to the record and footnote omitted.)

In the instant case, the Department's tenured faculty reviewed Dr. Lee's tenure file and unanimously voted in favor of recommending Dr. Lee for promotion and tenure during her 2015 tenure review. On January 15, 2016, the SARC met to assess and discuss Dr. Lee's tenure file and recommended tenure.[4] Next, the dean of the Department, L.B., evaluated Dr. Lee's file and endorsed the Department's recommendation to promote and award tenure to Dr. Lee. Dean L.B. then forwarded her recommendation for promotion and tenure to the PTRC.

The PTRC undertook its review of Dr. Lee's tenure file in March 2016 and produced

---

[4] As Vanderbilt explains in its appellate brief, the SARC is comprised of "two members from each division within the College and certain ex officio members from the deans' staff" and operates in an advisory capacity only; the SARC does "not vote or make any binding decisions."

a memorandum (the "PTRC Memorandum") summarizing its deliberations. In the memorandum, the PTRC chairperson, T.G., acknowledged that the Department's tenured faculty, the Department chairperson, and the SARC had all recommended Dr. Lee for promotion and tenure. Chairperson T.G. also noted that each of the eight external reviewers had been "favorable on tenure" and that Dr. Lee's teaching evaluations and service to the Department were "solid." Concerning Dr. Lee's teaching record, the PTRC had concluded that her teaching met Vanderbilt's "standard of high level of effectiveness." The PTRC had also concluded that Dr. Lee had met the expectation for "satisfactory performance in service." However, despite these positive points, the PTRC Memorandum stated that due to deficiencies in Dr. Lee's scholarly work, the PTRC had ultimately decided against awarding tenure to Dr. Lee by a vote of two in favor and five opposed.

Concerning Dr. Lee's scholarship, the PTRC Memorandum reflected the PTRC's reservations concerning both the quantity and quality of Dr. Lee's work, stating that her record lacked the "level of productivity and accomplishment expected for tenure." Specifically, it noted that although Dr. Lee had been directed in 2010 to "focus on publishing in peer-reviewed journals," her tenure file included only "one book and one published article (plus one forthcoming)." Additionally, the PTRC Memorandum stated that Dr. Lee had "not made significant progress on her second book" and had generally shown "very low productivity over the course of her academic career." In the memorandum, PTRC Chairperson T.G. discussed the comments made by the eight "external reviewers" that had been chosen by Vanderbilt and Dr. Lee to review her work for the tenure process. Although each of the reviewers had recommended Dr. Lee for promotion and tenure, PTRC Chairperson T.G. noted that the external reviews had also raised "serious concerns about the nature of [Dr. Lee's] published work."

The PTRC informed Dean L.B. of its decision to deny Dr. Lee's tenure application in a separate memorandum. Dean L.B. appealed the PTRC's decision to Provost S.W., who independently reviewed Dr. Lee's tenure file and rejected Dean L.B.'s appeal. On July 13, 2016, Dr. Lee submitted a grievance against then-Chairperson of the Department, K.M.; Provost S.W.; and the PTRC. Dr. Lee alleged that Vanderbilt's standards for tenure had been "subjectively and unfairly applied" because of "personal bias" against her.

Vanderbilt assembled an *ad hoc* grievance committee to review Dr. Lee's grievance. The grievance committee determined that Dr. Lee's tenure review had not been procedurally deficient. However, the committee acknowledged that Dr. Lee had suffered illnesses during her probationary period and that Vanderbilt had not "fully address[ed]" these illnesses when they occurred. Accordingly, the committee granted Dr. Lee three additional years on her probationary period and allowed her to apply for tenure again during the 2018-2019 academic year. N.Z., who was Vanderbilt's chancellor at the time, accepted the grievance committee's recommendation and extended Dr. Lee's probationary period for three years.

In 2018, Dr. Lee applied for tenure a second time. By that time, she had added to her *curriculum vitae* an article published in 2017 in *Arethusa* magazine, an article published in 2018 in the refereed journal *Antika Kunst*, and an article accepted to be published in 2019 in the refereed journal *Classical World*. Dr. Lee's second book remained under contract but had not yet been completed. In September 2018, after the second tenure review was underway, Dr. Lee supplemented her tenure file by adding a rough draft of the first chapter from her second book project.

Dean L.B. formed an *ad hoc* committee to assess Dr. Lee's scholarship for her second tenure review, naming Professor K.C. as chairperson and appointing four other faculty members to serve on the committee. Dr. Lee proposed six scholars to serve as external reviewers, and the Department proposed five scholars to serve as external reviewers. Of these, the *ad hoc* committee chose nine external reviewers, seven of whom sent letters assessing Dr. Lee's scholarship. According to Vanderbilt, "[t]he letters from the 2018 external reviewers, like those from the 2015 external reviewers, reflected a mix of praise and criticism for [Dr.] Lee's scholarship." The *ad hoc* committee also reviewed published reviews of Dr. Lee's first book: *Body, Dress, and Identity*.

In September 2018, the *ad hoc* tenure review committee prepared a ten-page report concerning its review of Dr. Lee's scholarship, citing examples from the external review letters and the public reviews of Dr. Lee's book. The committee report reflected that the reviews from the external reviewers concerning Dr. Lee's scholarship were both negative and positive. The committee did not make a recommendation for or against tenure but concluded the scholarly review portion of its report by stating: "[The outside referees] all agreed that Professor Lee's scholarly achievements and promise for further contributions to the field to be consonant with promotion to Associate Professor with tenure." The committee had also reviewed Dr. Lee's teaching record and service to the Department and found these to be positive.

On November 16, 2018, the acting chairperson of the Department sent a memorandum to College Dean J.G., who had replaced Dean L.B., recommending that Dr. Lee be awarded tenure. The Department chairperson stated in the memorandum that all six external reviewers and the *ad hoc* committee had agreed that Dr. Lee had met the standards for tenure but that the Department faculty had raised "significant" concerns about Dr. Lee's scholarly work and contributions. The Department faculty had ultimately voted four in favor of tenure, three against. The Department chairperson concluded that the decision to recommend tenure had been "largely based on [Dr. Lee's] teaching record, her solid service, and on the merits of a well-received first book, a growing list of peer-reviewed publications and edited-volume chapters, and the contract for a second book."

The SARC met in February 2019 and produced an advisory letter to Dean J.G. summarizing its discussion concerning Dr. Lee's second tenure review. The SARC noted that the faculty's "split vote" (4-3) had made it difficult to determine whether Dr. Lee had

met the research standard necessary for tenure but that Dr. Lee's record of securing outside funding was "excellent," her teaching was "highly effective," and her record of service was "appropriate."

After reviewing the memoranda from the Department and the SARC, Dean J.G. denied Dr. Lee's application. The tenured faculty of the Department voted unanimously against appealing Dean J.G.'s decision to deny Dr. Lee's second tenure application. Dr. Lee filed a second grievance on May 9, 2019, alleging gender discrimination, retaliation, breach of employment contract, and failure to follow proper procedures. Vanderbilt formed an *ad hoc* committee in November 2019 to review the substance of Dr. Lee's grievance. On May 12, 2021, the chair of the *ad hoc* committee wrote a final report recommending that Vanderbilt deny Dr. Lee's second grievance.

On May 3, 2022, Dr. Lee filed a complaint in the trial court against Vanderbilt, alleging one count each of gender discrimination, retaliation, and breach of contract. Dr. Lee filed an amended complaint on July 11, 2022. Upon a motion to dismiss filed by Vanderbilt on September 12, 2022, and heard by the trial court on November 18, 2022, the trial court dismissed "Count I" (gender discrimination) and "Count II" (retaliation) of the first amended complaint. The trial court declined to dismiss Dr. Lee's "Count III" claim for breach of contract. Instead, in an order dated November 29, 2022, the trial court ordered Dr. Lee to file an amended pleading reflecting the dismissal of the first two counts and a "more definite statement" as to the breach of contract claim.

On December 6, 2022, Dr. Lee filed an "Amended Complaint Pursuant to Order Filed November 29, 2022" in which she removed Counts I and II concerning gender discrimination and retaliation. Dr. Lee concomitantly filed a document entitled, "Plaintiff's More Definite Statement in Support of her Amended Complaint Pursuant to Court's Order." On January 3, 2023, Vanderbilt filed a motion to strike Dr. Lee's December 6, 2022 amended complaint and more definite statement, arguing that Dr. Lee had failed to identify "the version of the faculty manual on which she relie[d] for the breach of contract claim, the provisions of the operative faculty manual allegedly breached by [Vanderbilt], and facts as to how those provisions were breached." Additionally, Vanderbilt claimed that Dr. Lee had failed to attach the applicable faculty manual as an exhibit to her amended complaint.

On January 20, 2023, the trial court conducted a hearing on Vanderbilt's motions and on February 2, 2023, entered an order granting Vanderbilt's motion to strike Dr. Lee's December 6, 2022 amended complaint and her more definite statement. However, the trial court declined to dismiss the case and instead instructed Dr. Lee to file a "unitary amended pleading" containing additional details to support her breach of contract claim. In February 2023, Dr. Lee filed an amended complaint in compliance with the trial court's February 2, 2023 order. In the February 2023 amended complaint, Dr. Lee's sole remaining claim against Vanderbilt was for one count of breach of contract.

Subsequently, the parties filed countervailing motions for summary judgment. In a final order entered on April 1, 2024, the trial court denied Dr. Lee's motion for summary judgment and granted Vanderbilt's motion for summary judgment, dismissing the case with prejudice. The trial court first determined that this Court's decision in *Figal*, 2013 WL 5459021, established the proper standard of review for a court to use when reviewing an academic institution's promotion and tenure decisions. The trial court additionally noted that both parties had agreed that *Figal* controlled. The court stated that the parties had each submitted "voluminous" evidence, including "more than 360 statements of facts and hundreds of exhibits" relative to their summary judgment motions. The court distilled this evidence into a section of the order entitled, "undisputed facts."

The trial court then undertook its analysis, addressing each of Dr. Lee's averments in her February 2023 amended complaint. Dr. Lee had focused much of her breach of contract claim on the PTRC Memorandum that had been sent to Provost S.W. during Dr. Lee's first tenure review in 2015. Dr. Lee had claimed that: (1) the PTRC Memorandum constituted an "*ex parte* communication," in violation of the Faculty Manual and College Rules; (2) the PTRC should have sent the PTRC Memorandum in its entirety to Dean L.B.; (3) the PTRC should have sent the PTRC Memorandum to Dr. Lee; and (4) the PTRC Memorandum misrepresented Dr. Lee's scholarly work. The trial court found each of these claims to be without merit.

Next, the trial court reviewed Dr. Lee's claims concerning her 2018-19 tenure review. These included Dr. Lee's claims that during her second tenure review, Dean J.G. had: (1) "penalized" her for having received a three-year extension on her probationary period; (2) intentionally interpreted "neutral or positive language" from the external reviewers in a negative light; and (3) recommended against granting her tenure in retribution for her filing a grievance following her first tenure review. The trial court also found these claims to be without merit.

The trial court concluded that Dr. Lee had failed to show a "substantial departure from Vanderbilt's tenure review process under the Faculty Manual or from accepted academic norms." Absent proof of such substantial departure, the trial court stated that it must "not intrude upon or second-guess" Vanderbilt's decision to deny tenure to Dr. Lee under the standard adopted in *Figal*. Accordingly, the trial court granted summary judgment in favor of Vanderbilt and dismissed the case with prejudice. Dr. Lee timely appealed.

## II. Issues Presented

Dr. Lee raises the following issues on appeal, which we have restated and reordered as follows:

1.  Whether the trial court erred by granting summary judgment in favor of Vanderbilt when the facts demonstrated that Vanderbilt had exhibited a substantial departure from accepted academic norms or procedural regularity in its decisions concerning Dr. Lee's bid for tenure.

2.  Whether the trial court erred by granting summary judgment in favor of Vanderbilt when Vanderbilt had violated its own policies and procedures by (1) allowing the PTRC Memorandum to be included in Dr. Lee's tenure file and (2) concealing the contents of the PTRC Memorandum from the dean of the Department.

3.  Whether Dr. Lee would have been granted promotion and tenure at Vanderbilt in the absence of Vanderbilt's alleged breach of its contractual obligations.

4.  Whether the trial court erred by failing to find that Vanderbilt retaliated against Dr. Lee for her claims of gender discrimination, an act which resulted in a substantial departure from accepted academic norms and procedural regularity.

### III.  Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc*., 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)).  As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied."  *Rye v. Women's Care Ctr*., 477 S.W.3d at 250 (citation omitted).  According to the Tennessee Supreme Court:

[I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.  We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis.  Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material

facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*[ *v. Zenith Radio Corp.*], 475 U.S. at 586, 106 S. Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. . . . [A]fter adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65. Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014). "Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'" *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 889 (Tenn. 2019) (quoting *Rye*, 477 S.W.3d at 265).

Our standard of review for contract interpretation is "de novo on the record according no presumption of correctness to the trial court's conclusion of law." *Old Hickory Coaches, LLC v. Star Coach Rentals, Inc.*, 652 S.W.3d 802, 812 (Tenn. Ct. App. 2021) (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)). "[A] cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Id.* (citing *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005)).

IV. Review of Tenure Decisions Under *Figal v. Vanderbilt*

Both parties and the trial court relied upon this Court's decision in *Figal* as setting forth the proper standard for a court to use when reviewing an academic institution's promotion and tenure decisions. *See* 2013 WL 5459021. The trial court explained its adherence to the standard in *Figal* as follows:

> The parties agree that the Tennessee Court of Appeals' unpublished decision in *Figal v. Vanderbilt University* establishes the standard of review that applies to an academic institution's promotion and tenure decisions. No. M2012-02516-COA-R3-CV, 2013 WL 5459021 (Tenn. Ct. App. Sept. 27, 2013). As held in that decision, courts are to construe a contract between the institution and the candidate under the "usual rules of contract interpretation." *Id*., at *10. But the courts should not substitute their judgment for that of the university's unless there is a "substantial departure" from procedural requirements that affected the university's decision, or from "accepted academic norms" such that the [university] "did not actually exercise professional judgment." *Id*., at **14, 10. This standard acknowledges that professorial tenure appointments call for the university's "subjective and scholarly judgments" of "teaching ability, research scholarship, and professional stature" not typical of "employment decisions generally," and are best left "to the university's professional judgment." *Id*., at **9, 16. The Court of Appeals in *Figal* relied on a "host of federal cases" in adopting the foregoing standard, acknowledging that "'tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally,'" and the courts' "reluctance to review tenure decisions requiring an assessment of academic scholarship or the resolution of academic disputes in advanced fields of study." *Id*., at *9 (citations omitted). Where the issue presented is whether the candidate meets the university's standards for excellence in scholarship, courts should defer to the university's professional judgment. *Id*., at *10. The Court in *Figal* also held that the "candidate has the burden of proving that he or she meets the criteria for tenure." *Id*., at *1.

As in this case, *Figal* involved a faculty member's claim for breach of contract against Vanderbilt after Vanderbilt denied her application for tenure. *Figal*, 2013 WL 5459021, at *4. The trial court in *Figal* had granted summary judgment in favor of Vanderbilt, determining that although the plaintiff, Dr. Figal, had succeeded in demonstrating that Vanderbilt had departed in some respects from the requirements of the Faculty Manual during her tenure review, Dr. Figal had failed to demonstrate a "substantial departure" on Vanderbilt's part from its procedures. *Id.* at *4. Dr. Figal argued on appeal that the trial court had erred by "applying a more relaxed and deferential standard of

contract interpretation in favor of Vanderbilt" simply because the contract involved an award of tenure at a university. *Id*. at *5. The *Figal* Court disagreed, affirming and adopting the trial court's more deferential standard for reviewing university tenure decisions. *Id*. at *10. The *Figal* Court noted that the "trial court did not defer to Vanderbilt's interpretation of the terms of the contract, but did defer to Vanderbilt's assessment of the strength or weakness of Dr. Figal's work." *Id*. at *8. The Court determined that "[a]bsent evidence of discrimination or a substantial departure from academic norms, a university's assessment of a [tenure] candidate's scholarly excellence is a matter within the professional judgment of the university." *Id*. at *13.

In the instant case, Dr. Lee does not dispute that *Figal* sets forth the proper standard of review for courts to use when reviewing an academic institution's tenure decisions. Dr. Lee accurately quotes the *Figal* Court as providing that the "burden of proof" regarding tenure "lies squarely with the candidate, whose credentials must demonstrate the very high standard of excellence required by a research university like Vanderbilt." *Id*. at *11. However, Dr. Lee then contends that the trial court erred by interpreting *Figal* as placing a "second" burden upon the tenure candidate to demonstrate that he or she is deserving of tenure. Dr. Lee states: "While [Vanderbilt's] Faculty Manual places the burden upon the [tenure] candidate to demonstrate that he or she is deserving of promotion and tenure, this Court's opinion in *Figal* does not impose a second such burden." Dr. Lee does not expound on how the trial court supposedly interpreted *Figal* as placing a "second" burden upon the tenure candidate.

In proffering this argument, Dr. Lee appears to be contesting the trial court's statement that "[t]he Court in *Figal* also held that the 'candidate has the burden of proving that he or she meets the criteria for tenure.'" (quoting *Figal*, 2013 WL 5459021, at *1). However, a reading of this quote in context reveals that the *Figal* Court was not introducing an additional burden upon tenure candidates but was instead reviewing and summarizing the existing burden that was already a part of Vanderbilt's tenure review process. *See id.* (summarizing Vanderbilt's tenure review process and the requirements for tenure as stated in Vanderbilt's Faculty Manual and College Rules). Thus, despite the trial court's statement that *Figal* "held" that the tenure candidate bears the burden to prove that he or she deserves tenure, the *Figal* Court did not add a "second" burden of proof upon the tenure candidate.

Significantly, nothing in the trial court's order indicates that the trial court interpreted *Figal* as imposing a "second" burden upon the tenure candidate. Therefore, we deem harmless any error on the part of the trial court in stating that the *Figal* Court "held" that tenure candidates bear the burden of proof that they are deserving of tenure. Accordingly, Dr. Lee's argument on this point is unavailing, and we determine that the trial court properly applied the standard set forth in *Figal* to this case.

V. The PTRC Memorandum

- 12 -

Dr. Lee contends that the PTRC Memorandum, which was sent to the provost during Dr. Lee's first bid for tenure, constituted an unauthorized "*ex parte*" communication prohibited by the Faculty Manual. Dr. Lee further argues that the inclusion of the PTRC Memorandum in her first tenure review file constituted "a substantial departure from accepted academic norms and procedural regularity." *See Figal*, 2013 WL 5459021, at *7 (adopting the reasoning that "[o]nly a substantial departure from accepted academic norms or from procedural regularity, to demonstrate that the university did not actually exercise professional judgment, warrants court intervention."). Dr. Lee predicates her argument on a provision within the Faculty Manual chapter entitled: "Procedures for the Award of Tenure from Within the University." The relevant subsection, entitled, "Procedures for Review and Assessment by the Faculty," states in pertinent part:

> Except as stated above, no faculty member other than the department chair or Dean may add materials to the dossier [tenure application] for consideration at higher levels of review of the faculty decision. It is inappropriate for faculty members, including those outside of the department or school, to attempt to influence the deliberations on renewal, promotion, or tenure that come after the vote of the faculty, except to bring an allegation of professional misconduct. "Professional misconduct" means any conduct on the part of a faculty member that might reasonably lead to disciplinary action under Part IV, Chapter 1 (Disciplinary Actions) of the Faculty Manual. Persons involved in subsequent levels of review should not accept or consider additional unsolicited documents and should discourage any communications that seek to influence their decisions.

Dr. Lee urges that according to this language, the PTRC Memorandum should not have been included in her tenure file or sent verbatim as a communication to the provost. In support, Dr. Lee posits that "reporting the decision of the PTRC Memorandum [was] a clear effort to influence the recipients at higher levels of review." We respectfully disagree.

There is no language included in either the above section or anywhere in the Faculty Manual that prohibits the PTRC from communicating its recommendation to the provost after reviewing a tenure candidate's file. On the contrary, the Faculty Manual requires the PTRC to communicate its recommendation concerning tenure to the provost. Dr. Lee acknowledges as much in her appellate brief, wherein she states that the "PTRC reports all of its decisions to the Provost[.]" The Faculty Manual outlines the general, multi-tiered procedure for the award of tenure, including the PTRC's role within that procedure, as follows:

> In addition to the involvement of the tenured faculty, consideration of appointment to tenure involves (a) the dean of the school, acting in accordance with the standards and procedures of the school; (b) the [PTRC];

(c) the Provost; (d) the Chancellor and (e) the Board of Trust.

The Faculty Manual then explains in further detail the role and procedures specific to the PTRC:

> When tenure is recommended by a Dean, the PTRC evaluates the recommendation on the basis of its consistency with University standards and with the statement of standards and procedures required by the school . . . .

> The award of tenure requires a positive recommendation from the [PTRC].  A negative recommendation by the [PTRC] may be appealed by the Dean to the Provost, except where the candidacy has reached the [PTRC] by the Dean's overruling a negative departmental or school recommendation.  An appeal by the Dean must be made within thirty business days after receipt of the written report of the [PTRC].  The final decision should be communicated in writing from the appropriate Dean, or the Provost, to the faculty member.

(Emphasis added.)  As the trial court noted, the College Rules are silent on the procedures governing the PTRC.

Here, Dean L.B. recommended that Dr. Lee be awarded promotion and tenure in 2016, and Dr. Lee's file was then transmitted to the PTRC for review.  The PTRC evaluated Dr. Lee's file in a meeting held on March 16, 2016, as required by the above sections from the Faculty Manual.  After the PTRC considered Dr. Lee's tenure file, it was required to make a recommendation to the next-tier reviewer, in this case, the provost, before tenure could be awarded.  Accordingly, PTRC Chairperson T.G. summarized the PTRC's meeting concerning Dr. Lee's file in the PTRC Memorandum and sent it to Provost S.W.

As Dr. Lee acknowledges in her appellate brief, the Faculty Manual dictates that the "award of tenure requires a positive recommendation from the [PTRC]."  Therefore, we conclude that the PTRC Memorandum was not an "unsolicited" addition to Dr. Lee's tenure file intended to "influence" the provost but was rather a necessary component of the tenure review process as dictated by the Faculty Manual.  The Faculty Manual is silent as to what form the PTRC's recommendations to the provost should take.  In reviewing Vanderbilt's policies, we find no prohibition against the PTRC's submission of its recommendations for tenure to the provost in the form of a memorandum or other written document.  There is also nothing in the Faculty Manual, the College Rules, or the College Guidelines that prohibits the PTRC Memorandum from being added to Dr. Lee's tenure review file.  Accordingly, Dr. Lee's argument that the PTRC Memorandum was an "unauthorized *ex parte* communication to the Provost" is unavailing.

Through similar reasoning, we also reject Dr. Lee's contention that the PTRC Memorandum was intentionally and wrongfully concealed from Dean L.B. and that such concealment represented a "substantial departure from accepted academic norms and procedural regularity." The Faculty Manual requires the PTRC to "report" negative tenure decisions to the appropriate college dean, but it does not require the PTRC to provide the dean with a report identical to that which the PTRC submits to the provost. The record reflects that the PTRC did report its negative decision and reasoning concerning Dr. Lee's bid for tenure to Dean L.B. and that Dean L.B. timely appealed the decision. Thus, the PTRC's actions concerning the PTRC Memorandum and its subsequent communication to the dean did not constitute a substantial departure from accepted academic norms and procedural regularity. *See Figal*, 2013 WL 5459021, at *7.

Dr. Lee further maintains that the PTRC Memorandum contains "false information" respecting her progress in publishing scholarly works. Specifically, she asserts that the portion of the PTRC Memorandum concerning her scholarly accomplishments "misrepresents the record" because it states that her tenure file consisted of "one book and one published article (plus one forthcoming)." Upon reviewing the PTRC Memorandum and the evidence presented at trial, the trial court determined as follows:

> [Dr. Lee] complains the [PTRC Memorandum] misstates the number of peer-reviewed journal articles she had published after she arrived at Vanderbilt. The PTRC's statement, however, can be confirmed by a review [of] [Dr.] Lee's curriculum *vitae*, which was in her tenure file. [Dr.] Lee arrived at Vanderbilt in 2008. Under the heading "Articles in refereed journals," one article is listed as having been published in 2015, and one "accepted for publication." There are three other articles listed as having been published in 2004 and 2006, before [Dr.] Lee came to Vanderbilt. Thus, the [PTRC Memorandum] accurately stated the number of peer-reviewed journal articles [Dr.] Lee had published after her arrival at Vanderbilt.

(Citations to the record omitted.)

The appellate record supports the trial court's conclusion. As the court noted, Dr. Lee's *curriculum vitae* corroborates the PTRC's finding that Dr. Lee had published only one article in a "refereed" journal at the time of her first tenure review. Under the heading, "Articles in Refereed Journals," Dr. Lee's 2015 *curriculum vitae* includes the following relevant entries:[5]

[No date]    "The Gendered Economics of Greek Bronze Mirrors: Reflections on reciprocity and feminine agency" (accepted for

---

[5] As noted by the trial court, there are three other articles listed in this section, but all of them were published in or before 2006, during the timeframe prior to Dr. Lee's employment at Vanderbilt.

publication in *Arethusa*).

2015       "Other 'Ways of Seeing': Female viewers of the Knidian Aphrodite," *Helios* 42.1, 103-122.

Dr. Lee's statement of endeavors, which she also submitted as part of her tenure file, lists the same two articles under the heading, "Articles in Refereed Journals." Thus, Dr. Lee's own *curriculum vitae* and statement of endeavors are consistent with the trial court's findings concerning her published works. Additionally, Department Dean K.M., wrote a letter dated October 28, 2015, to Dean L.B. and the SARC recommending Dr. Lee for tenure. In the letter, Dean K.M. stated that Dr. Lee had "placed two articles in refereed journals and submitted two others for publication" This statement, along with Dr. Lee's *curriculum vitae* and statement of endeavors, corroborates the PTRC's determination that Dr. Lee's record for tenure consisted "of one book and one published article (plus one forthcoming)."

Dr. Lee argues that the trial court's assessment of her scholarly work was inaccurate because the record also included other "articles which had been submitted to peer reviewed journals." However, an article <u>submitted</u> for acceptance into a peer-reviewed journal is not the same as an article <u>published or accepted for publication</u> by a peer-reviewed journal. Dr. Lee's argument on this point is unavailing. Furthermore, we note that Dr. Lee did not include any of these additional submitted articles in either her *curriculum vitae* or statement of endeavors under the heading, "Articles in Refereed Journals."

Dr. Lee avers that her tenure file "also consisted of various book chapters which were peer reviewed." Indeed, under the "Book Chapters" heading in her *curriculum vitae*, Dr. Lee listed two book chapters she had published in 2012, one of which she described in her statement of endeavors as having been published in a "peer reviewed volume on mothering and motherhood in the ancient world." However, the record establishes that these book chapters are not "published articles" as contemplated by the College Guidelines. In providing which materials should be included in a tenure candidate's *curriculum vitae*, the College Guidelines document expressly separates "book chapters" from "articles in refereed journals" in its delineation of the various types of scholarly works that should be included in a tenure candidate's *curriculum vitae*, as follows:

- Books (in print or accepted for publication)
- <u>Articles (in print or accepted) in refereed journals</u>
- <u>Book chapters</u>
- Articles in conference proceedings
- Book reviews
- Working papers and books
- Research grants received

- Research grant proposals currently under review
- Invited presentations
- Published abstracts
- Conference presentations

(Emphasis added.)[6]

By separating "book chapters" from "articles" in refereed journals, the College Guidelines contemplate that book chapters are a different type of scholarly work than articles for publication in refereed journals. Significantly, Dr. Lee appears to have been aware of these distinct categories of accepted scholarly work when she applied for tenure in 2015 because she listed her scholarly works under nearly these exact headings in her *curriculum vitae*.[7] The *curriculum vitae* also included sections entitled, "encyclopedia entries" and "book reviews," of which Dr. Lee represented that she had published four encyclopedia entries in 2010 and one book review in 2012. In addition, Dr. Lee's *curriculum vitae* included a section entitled, "working papers and books," with selections that were listed as either "under contract," "under review," "in preparation," or "in development." Nothing in Dr. Lee's *curriculum vitae*, statement of endeavors, or the record indicates that any of these additional listed scholarly works had been published in peer-reviewed journals.

By reason of the foregoing, we determine that the PTRC's consideration of Dr. Lee's published works was consistent with the College's express expectations for tenure and was not a substantial departure from accepted academic norms and procedural regularity. *See Figal*, 2013 WL 5459021, at *7. Ergo, we conclude that the trial court did not err when finding that "the PTRC [Memorandum] accurately stated the number of peer-reviewed journal articles Lee had published after her arrival at Vanderbilt."

Dr. Lee next challenges the statement in the PTRC Memorandum that she had not made "significant progress on her second book" by the time of her first tenure review. Dr. Lee argues that the trial court "erred in concluding that 'significant progress' represents merely a subjective judgment rather than a fact to be determined by a jury." Concerning the PTRC's findings as they related to Dr. Lee's second book and other scholarly works, the trial court explained:

---

[6] The version of the College Guidelines included in the record on appeal was revised in May 2018 and sent to all department chairpersons and program directors within the College on September 11, 2018. It is unclear which portions of the Guidelines had been revised, but neither party contests the inclusion in the record of the updated version for the purposes of this appeal.

[7] Dr. Lee's 2015 *curriculum vitae* included sections of scholarly works grouped under the following headings, in order: "books," "articles in refereed journals," "book chapters," "encyclopedia entries," "book reviews," "working papers and books," "invited presentations," and "conference presentations."

The remainder of [Dr.] Lee's complaints concern more subjective statements and scholarly judgment found in the [PTRC Memorandum]: that [Dr.] Lee had not made "significant progress" on her second book; that external reviewers found her book "failed to make a significant contribution"; that the external reviewers' analyses did not support their conclusions that tenure was warranted; and that the external reviewers "raised serious concerns about the nature of [Dr. Lee's] published work." [Dr.] Lee asserts that these statements are not true, and their inclusion in the [PTRC Memorandum] violated Vanderbilt's tenure procedures. [Dr.] Lee sets forth multiple statements of "fact" to support her position, but many of those statements are conclusory, consist of argument instead of facts, include only excerpts of testimony or documents, or recite or summarize passages from the [PTRC Memorandum] and then simply declare those statements to be untrue. Vanderbilt "disputes" many of [Dr.] Lee's statements of "fact," in whole or in part, but argues they are immaterial for purposes of summary judgment where the [PTRC Memorandum] contains "subjective expressions of academic judgment that may not be properly characterized as true or false."

Herein lies the heart of the issue presented. The [PTRC Memorandum] summarizes its discussion of and decision on [Dr.] Lee's tenure file, which necessarily includes the PTRC's subjective assessments and judgments about [Dr.] Lee's tenure application. These are the very type of "subjective and scholarly judgments" regarding professorial appointments by universities to which courts should defer and not second-guess. *Figal*, 2013 WL 5459021, at *10.

(Citations to the record and footnote omitted.)

Upon careful review, we agree with the trial court that Dr. Lee's proffered statements of undisputed facts concerning her scholarship and progress toward her second book—as well as her responses to Vanderbilt's statements of undisputed material facts on these topics—are not facts, but consist solely of legal arguments, inferences, conclusory statements, and the selectively curated subjective opinions of faculty members who supported Dr. Lee's first bid for tenure. Dr. Lee contends that the trial court ignored the positive statements made by Dean L.B. and other external reviewers concerning her scholarship and did not assign proper weight to evidence in the record of Dr. Lee's progress on the second book. However, the trial court expressly stated that "the PTRC acknowledged in its memo that 'all reviewers ultimately supported tenure[.]'"

Moreover, Dr. Lee admitted in her responses to Vanderbilt's statement of undisputed facts that as of 2017—one year following her first bid for tenure was rejected—she had not written "a single chapter" of her second book and that in 2018, she still "did

- 18 -

not have any chapters of her second book ready for review by the external reviewers[.]" She further acknowledged the truth of several of the negative statements rendered by external reviewers and other faculty members respecting the lack of quality and quantity of her scholarly achievements. Upon our thorough review, we conclude that the trial court was correct to determine that Dr. Lee did not present facts sufficient to survive summary judgment concerning Vanderbilt's assertion that she had not made "significant progress" toward her second book by the time of her first tenure review. *See Rye*, 477 S.W.3d at 264-65.

Dr. Lee's postulate that "[s]ignificant progress is an objective standard, not merely a subjective academic opinion" is also unpersuasive. Dr. Lee provides no legal authority or reference to the Faculty Manual, College Rules, or College Guidelines to support this assertion. On the contrary, in *Figal*, this Court reached the opposite conclusion, stating that "[p]rofessorial appointments necessarily involve 'subjective and scholarly judgments.'" *See Figal*, 2013 WL 5459021, at *9 (citation omitted). Accordingly, we determine that Dr. Lee's arguments on this point are unavailing.

## VI. Retaliation

Dr. Lee asserts that in denying her second application for tenure in 2018, Vanderbilt retaliated against Dr. Lee for filing a grievance in 2016 after her first application was denied. Dr. Lee urges that as part of this retaliation, Dean J.G. intentionally "penalize[d]" her for receiving an additional three years' probationary period and "manufactured false claims of 'code words' and 'clues' in order to turn positive recommendations [by external reviewers] into negative evaluations." In addition, Dr. Lee claims that the *ad hoc* committee formed to consider her second tenure application included Department faculty who were "angry" that she had previously filed a grievance against the Department. Vanderbilt counters that Dr. Lee's claim of retaliation is not properly before this Court because the trial court had previously dismissed Dr. Lee's retaliation claim before it conducted the hearing on the competing motions for summary judgment and entered its April 1, 2024 final order.

On November 29, 2022, the trial court entered an order dismissing Dr. Lee's claims of gender discrimination and retaliation. The trial court determined that those causes of action were barred in the trial court by the Tennessee Human Rights Act ("THRA"), codified at Tennessee Code Annotated §§ 4-21-101, *et seq.*, because Dr. Lee had filed a parallel action in federal court based on a "common nucleus of operative facts." *See* Tenn. Code Ann. § 4-21-314 (West July 1, 2014, to May 11, 2025) ("No employee may concurrently maintain a cause of action in state court under § 4-21-401, § 8-50-103, or § 50-1-304, while at the same time prosecuting an action in federal court based on a common nucleus of operative facts.").[8] There is no evidence in the record that Dr. Lee filed any

---

[8] Tennessee Code Annotated § 4-21-314 has since been repealed by 2025 Tenn. Pub. Acts, Ch. 471, § 3,

motions in objection to the trial court's dismissal of her gender discrimination and retaliation claims pursuant to the THRA.[9] Instead, the record demonstrates that on December 12, 2022, Dr. Lee filed an "Amended Complaint Pursuant to Order Filed November 29, 2022," which omitted the gender discrimination and retaliation claims against Vanderbilt, leaving only her breach of contract claim. Upon subsequent order of the trial court, Dr. Lee filed a "Revised Amended Complaint Pursuant to Order Arising from January 20, 2023 Hearing," which also included only the breach of contract claim. By acquiescing to the trial court's dismissal of her retaliation claim pursuant to the THRA, Dr. Lee has waived her ability on appeal to assert that the trial court erred in dismissing the claim on that ground. *See Duke v. Duke*, 563 S.W.3d 885, 898 n.2 (Tenn. Ct. App. 2018) ("It is well settled that issues not raised at the trial level are considered waived on appeal." (quoting *Moses v. Dirghangi*, 430 S.W.3d 371, 381 (Tenn. Ct. App. 2013))).

Even had Dr. Lee presented an objection to the trial court's dismissal of her retaliation claim, she has not included such objection to the dismissal in her statement of the issues or in the argument section of her appellate brief. Instead, Dr. Lee attempts to litigate the merits of the retaliation claim for the first time before this Court, rather than contest the trial court's dismissal of the claim pursuant to the THRA. Inasmuch as issues not raised in an appellant's statement of issues may be considered waived, we decline to address Dr. Lee's arguments concerning retaliation on appeal. *See Ethridge v. Estate of Ethridge*, 427 S.W.3d 389, 395 (Tenn. Ct. App. 2013) ("Issues not raised in the statement of the issues may be considered waived."). Accordingly, we do not reach the substantive portions of Dr. Lee's retaliation argument.

## VII. Conclusion

Having carefully reviewed and considered the voluminous record in this case, we determine that the facts do not establish that Vanderbilt exhibited a substantial departure from accepted academic norms or procedural regularity in denying Dr. Lee's applications for tenure. Therefore, the deferential standard for reviewing Vanderbilt's assessment of

---

effective May 12, 2025, and the subsection has been transferred to § 4-21-313 (West May 12, 2025, to current). Section 4-21-313 provides:

> An employee shall not concurrently maintain a cause of action in state court under § 4-21-401, § 8-50-103, or § 50-1-304 [governing claims of discrimination and retaliatory discharge], while at the same time prosecuting an action in federal court based on a common nucleus of operative facts. Upon motion of the employer, the state court shall dismiss an action maintained under § 4-21-401, § 8-50-103, or § 50-1-304, in which the employee is concurrently prosecuting an action based on a common nucleus of operative facts in federal court.

[9] In its order dismissing the gender discrimination and retaliation claims entered on November 29, 2022, the trial court indicated that Dr. Lee had opposed Vanderbilt's motion to dismiss, but there is no record of Dr. Lee's objection or the grounds upon which she opposed the motion.

Dr. Lee's scholarly work set forth in *Figal* is controlling.  *See Figal*, 2013 WL 5459021, at *7, 10.  Adhering to this standard, we determine that Vanderbilt did not breach its employment contract with Dr. Lee when it denied her applications for tenure during the academic years 2015-16 and 2018-19.  Dr. Lee's issue of retaliation is waived because she did not timely object to the trial court's dismissal of the retaliation claim pursuant to the THRA and she did not argue on appeal that the dismissal was error.  *See Duke*, 563 S.W.3d at 898 n.2; *Ethridge*, 427 S.W.3d at 395.  For these reasons, we affirm the trial court's April 1, 2024 final order in its entirety.  Costs on appeal are assessed to the appellant, Dr. Mireille M. Lee.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE